IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs March 31, 2021

**JEFFERY COMBS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C66727   James F. Goodwin, Jr., Judge**

_____

**No. E2020-00239-CCA-R3-PC**

_____

The Petitioner, Jeffery Combs, was found guilty by a jury of eighteen counts of forgery and one count of theft of property valued at more than $1,000 but less than $10,000, and he received a twelve-year sentence in confinement.  After this court affirmed the Petitioner's convictions on direct appeal, he filed a petition for post-conviction relief contending that trial counsel was ineffective because trial counsel failed to: consult a handwriting expert and properly advise the Petitioner of the cost of retaining one; thoroughly investigate or pursue a misidentification defense by seeking professional assistance to enhance the surveillance video and interviewing witnesses; consult with the Petitioner prior to trial; and convey a plea offer.  Following a hearing, the post-conviction court denied the petition, and the Petitioner appeals.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER., JJ., joined.

Joseph W. McMurray (on appeal), Kingsport, Tennessee, and Nicholas S. Davenport (at hearing), Morristown, Tennessee for the appellant, Jeffery Combs.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Emily Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial

The Petitioner was convicted by a Sullivan County jury of eighteen counts of forgery and one count of theft of property valued at more than $1,000 but less than $10,000 after he wrote fraudulent checks totaling $1,947.99 in transactions out of a credit union account belonging to his deceased mother, Ms. Mary Elizabeth ("Betty") Kelly Combs. *State v. Jeffery Combs*, E2014-01175-CCA-R3-CD, 2015 WL 2400793, at *1 (Tenn. Crim. App. May 20, 2015). The evidence presented at trial showed that in March 2011, the executor of Ms. Combs's estate, Mr. James P. Kelly, reported to the credit union servicing Ms. Combs's account that he believed someone had made fraudulent transactions on the account. *Id.* Mr. Kelly and Ms. Crystal Nottingham, a fraud prevention coordinator with the credit union, reviewed multiple transactions and found eighteen checks written to mostly grocery stores and restaurants between February and March of 2011, purportedly signed by the victim, and some of which included a driver's license number beginning with the same eight digits. *Id.* Ms. Nottingham testified that some checks were returned due to insufficient funds and that the remaining checks were treated by the credit union as forged checks. *Id.* at *2. However, the aggregate amount of the checks was $1,947.99, and she noted that the "'merchants [were] at a loss for all of them.'" *Id.*

Kingsport Police Department Corporal Ed Ragsdale testified that Mr. Kelly provided him with copies of the checks, all of which had been used at Kingsport businesses. *Id.* After speaking with Mr. Kelly and reviewing the checks, Corporal Ragsdale identified the Petitioner as a suspect and began seeking video footage from the businesses where the checks had been used. *Id.* However, he was only able to obtain video footage from one business, the IGA, because the other businesses did not have functioning video surveillance equipment at the time the checks were used. *Id.* Corporal Ragsdale compared the individual appearing in the IGA's surveillance video to a photograph obtained from a copy of the Petitioner's driver's license, and he showed the surveillance video to the Petitioner's sister, Ms. Angie Roberts. *Id.* He confirmed the Petitioner had a Kingsport address and that the driver's license number written on the forged checks matched the Petitioner's driver's license number, except that the last number was adjusted to be a 3, 4, or 6. *Id.*

Mr. Charles Robinette was a store manager of the IGA in Kingsport at the time the offenses took place, and he testified that he cooperated with the police by providing surveillance video showing the two transactions at his store taking place on March 2,

2011, and March 6, 2011, and providing the amounts of the checks used. *Id.* According to Mr. Robinette, two cartons of cigarettes were purchased on March 2, and two cartons of Marlboro cigarettes, as well as two gift cards, were purchased on March 6. *Id.* On cross-examination, Mr. Robinette testified that on March 6, the type of cigarettes purchased were "'more than likely going to be . . . Reds in a box'" because of the location that the employee pulled them from the shelf, but he was not able to tell from the video the exact color of the box. *Id.*

Mr. Kelly testified that Ms. Combs named her three children, including the Petitioner, Ms. Angie Roberts, and Mr. Kelly Combs, as beneficiaries to her estate. *Id.* at *3. According to Mr. Kelly, the three children "'agreed to take whatever they had felt that their mother had designated for them or what they wanted'" from Ms. Combs's condominium, which housed the majority of her belongings after her death. *Id.* The Petitioner agreed to help with renovations at the condominium, but Mr. Kelly was unsure if the Petitioner was alone during the times that he helped. *Id.* Mr. Kelly was unaware of any checkbooks left at the residence and was unaware of any burglary or theft at the condominium. *Id.* He destroyed the checkbooks he knew existed. *Id.* While Mr. Kelly was monitoring Ms. Combs's account online, he noticed transactions that he had not executed nor authorized. *Id.* Mr. Kelly could not identify the suspect in the surveillance video obtained from IGA, but he agreed that the individual was neither Ms. Roberts or Mr. Kelly Combs. *Id.* Mr. Kelly agreed that the suspect, who was wearing a baseball cap in the video, was of a similar age and build as the Petitioner. *Id.*

The defense presented the testimony of Ms. Angie Roberts, the Petitioner's sister. *Id.* Ms. Roberts testified that Corporal Ragsdale only showed her a "'picture on a computer screen'" rather than the IGA surveillance video. *Id.* According to Ms. Roberts, she was not able to identify the individual on the picture, and she explained that she "'couldn't say at 100% certain,'" or even that it was "'more likely than not,'" that the picture shown to her by Corporal Ragsdale was the Petitioner. *Id.* When shown the IGA surveillance video at trial, she testified that the individual in the video was not the Petitioner, but she agreed that the individual was male. *Id.* at *4. She testified that the individual's clothing was consistent with the clothing the Petitioner wore, but she could not identify the clothing as belonging to the Petitioner. *Id.* She confirmed that the Petitioner was a smoker, but she testified that the packaging of the style of cigarette he bought was gold and that she knew he bought individual packs rather than cartons. *Id.* She testified that the signature on the forged checks looked like her mother's handwriting. *Id.*

Corporal Ragsdale was recalled to offer rebuttal testimony, and he testified that he reviewed the surveillance video and still images with Ms. Roberts and that she said she

"'was almost positive that it was her brother.'" *Id.* Corporal Ragsdale agreed that Ms. Roberts asked him for a clearer picture, which he was unable to provide to her. *Id.*

The jury convicted the Petitioner of eighteen counts of forgery and one count of theft of property valued at more than $1,000 but less than $10,000. *Id.* The Petitioner received an effective sentence of twelve years of confinement. *Id.* On appeal, this court affirmed the Petitioner's convictions. *Id.* at *9.

## Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief and an amended petition, contending that he received ineffective assistance of counsel. As related to the issues raised on appeal, the Petitioner claimed that he received ineffective assistance of counsel because trial counsel failed to: consult a handwriting expert and properly advise him of the cost of retaining one; thoroughly investigate or pursue a misidentification defense by seeking professional assistance to enhance the surveillance video and interviewing witnesses; consult with the Petitioner prior to trial; and convey a plea offer. The post-conviction court held a hearing during which the Petitioner and the Petitioner's trial counsel testified.

The Petitioner testified that he was charged with writing unauthorized checks from his mother's estate, that he was an heir to the estate, and that he had already received a substantial part of his inheritance prior to the checks being written. On cross-examination, the Petitioner clarified that the money he received came from an insurance policy rather than from the estate itself. He hired trial counsel on March 1, 2013, after seeing him in court and being familiar with him through his representation on prior occasions. The Petitioner testified that he met with trial counsel on two occasions before trial and that although they talked on the telephone while the case was ongoing, the telephone conversations were about unrelated business matters. The Petitioner first met with trial counsel when he retained his services on the underlying case. The Petitioner testified that trial counsel's defense strategy centered around his arguing that Ms. Roberts did not identify the Petitioner in the IGA surveillance video. The Petitioner stated that approximately three days before trial, he and trial counsel met again to review the IGA surveillance video and discuss his case. During that meeting, trial counsel called an office supply store and Ms. Roberts to find a way to enhance the quality of the video, and trial counsel took a photograph of the Petitioner's gait. The Petitioner testified that he talked to trial counsel after the meeting concluded for approximately five minutes to discuss his efforts to find someone to enhance the video, but the Petitioner stated that he could not "get anything to enhance the video any more than it already was." He testified that he and trial counsel did not discuss the case prior to the beginning of the trial.

- 4 -

On cross-examination, the Petitioner testified that he knew where trial counsel's office was located and knew trial counsel's telephone number. When the Petitioner was asked why he did not talk to trial counsel about his case, the Petitioner stated that he did not ask trial counsel about the case because he did not know how to defend himself and relied on trial counsel to prepare an adequate defense. The Petitioner agreed that trial counsel possessed a copy of the State's evidence when he and trial counsel met to discuss the case. The Petitioner conceded that trial counsel did not refuse to talk to him, that trial counsel answered his telephone calls, and that trial counsel met with him as scheduled. The Petitioner disagreed that he met with trial counsel on April 25, 2013.

The Petitioner testified on direct examination that during his meeting with trial counsel a few days before trial, trial counsel informed him, "If I lose this case you're going to get a s**t load of time." He maintained that trial counsel did not advise him of the details of his sentencing exposure. The Petitioner said he was surprised by the sentence he received after trial.

The Petitioner stated that he asked trial counsel to retain a handwriting expert and that trial counsel replied that it would cost $40,000 to $50,000 to complete the analysis. The Petitioner informed trial counsel that he could not afford to pay for the analysis to be completed. However, the Petitioner testified that he was informed by one of his previous post-conviction attorneys that he found a handwriting analyst at East Tennessee State University whose services would cost $500. He stated that he would have had a chance to pursue that defense at trial had he known of its actual cost, that trial counsel did not present a defense exonerating the Petitioner based on the handwriting, and that he hoped the handwriting expert would have shown that it was not him who wrote the check or who appeared in the surveillance video. On cross-examination, the Petitioner stated that he did not call a handwriting expert to testify at the post-conviction hearing because he had been incarcerated and did not have access to money anymore. He agreed that he could have probably obtained access to $400 or $500 to consult with a handwriting expert for the hearing.

The Petitioner stated that Ms. Roberts was the only witness whom trial counsel presented at trial in his defense. On cross-examination, the Petitioner testified that trial counsel only talked to Ms. Roberts on the telephone and that he never met with her in person. The Petitioner agreed that Ms. Roberts testified at trial, that trial counsel asked her questions, and that she testified at times that she did not believe the individual in the surveillance video was the Petitioner.

The Petitioner testified that trial counsel should have interviewed other potential witnesses for purposes of calling them to testify at trial, including the cashiers at the businesses which received forged checks and the employee who accepted the check in the

surveillance video. The Petitioner stated that trial counsel did not pursue a complete misidentification defense because he failed to seek out supporting evidence for it. The Petitioner said neither he nor trial counsel had time to interview witnesses by the time he and trial counsel met about the case. On cross-examination, the Petitioner could not recall whether he provided trial counsel with names of witnesses whom he wanted trial counsel to interview. He testified on cross-examination that he knew of an individual who probably committed the offenses but that he did not provide the name of that individual to trial counsel. He stated that the witnesses he would have wanted to testify at trial were not at his post-conviction hearing because several years had passed since the trial. He further stated that he did not begin investigating the witnesses sooner because his charges were initially dropped, resulting in him retaining trial counsel approximately two years after the checks were written when he was charged again. The Petitioner agreed that he had to speculate about how the potential witnesses would have testified because he never talked to them. When asked if he knew the employees' names, the Petitioner responded by stating that he did not know how to defend himself in court and that was what his attorney was there to do for him.

According to the Petitioner, trial counsel advised him that he should not testify because he had a prior conviction. On cross-examination, the Petitioner agreed that he was convicted in 2009 of forgery, identity theft, and theft over $1,000.

The Petitioner testified that trial counsel never relayed any plea offers from the State. According to the Petitioner, he noticed paperwork on the day of trial. The Petitioner testified on cross-examination that when he noticed the paperwork he asked trial counsel, "What's this[?]" The Petitioner explained, "[Trial counsel] said that was a plea bargain, and I said, 'No.'" The Petitioner testified that trial counsel then stated, "Well, I didn't show it to you because I knew you wouldn't take it anyway." The Petitioned added, "[W]hich he's right. I probably wouldn't have t[aken] it." He stated that he was no longer able to accept the plea agreement on the day of trial.

Trial counsel testified that he met with the Petitioner on April 24 or 25 of 2013 to review the surveillance video and called Ms. Roberts on one of those dates, but he could not recall if he met with her in person. Trial counsel stated that he was prepared for trial after that meeting and that he probably met with the Petitioner again prior to trial and spoke on other occasions but that nothing had changed from the April 2013 meeting. Trial counsel testified on cross-examination that he requested discovery from the State in February of 2013 and reviewed the surveillance video, receipts, and checks contained in the discovery provided in response to the request. Trial counsel stated that he appeared on behalf of the Petitioner on May 3, 2013, for an announcement date and that the next court date after that was the trial date in October of 2013. The trial date was continued from October of 2013 to February of 2014. When asked if the Petitioner asked to spend

more time or go over additional evidence, trial counsel responded, "Well, I don't know that there [w]as anything else that we needed to go over."

Trial counsel testified that he thought the defense strategy of calling Ms. Roberts as a witness was strong, because based on her knowledge of the Petitioner, she identified inconsistencies in the facial hair, the amount of cigarettes purchased at a time, and the type of cigarettes purchased. On cross-examination, trial counsel testified that he investigated ways to enhance the surveillance video but could not identify a way to do so. He stated that he believed that the video would show that the Petitioner was not the person in the video once the technology was able to further enhance it. Trial counsel specified that it was not clear that the individual in the surveillance video was the Petitioner and that he identified inconsistencies at trial such as the way the Petitioner stood, the Petitioner's hair, and the Petitioner's facial hair. Trial counsel did not believe the State met its burden of proof at trial.

Trial counsel testified that he informed the Petitioner about a handwriting expert at East Tennessee State University, but he did not recall telling the Petitioner the expert's services would cost $40,000 or $50,000. Trial counsel stated that he had worked with the expert previously and would not have told the Petitioner that it cost that much. According to trial counsel, he did not hire an expert because the Petitioner could not afford to hire one. Trial counsel agreed on cross-examination that a handwriting expert would have had more trouble identifying forged writing since the person forging the check would have altered their handwriting to mirror the victim's handwriting. Trial counsel focused the defense strategy on arguing that the State did not have any witnesses who could identify the Petitioner in the video rather than seeking out the cashiers at the businesses to testify that the perpetrator was not the Petitioner. He identified Mr. Kelly as another potential witness, but he reiterated that neither Mr. Kelly nor any of the other witnesses identified the Petitioner in the surveillance video.

Trial counsel testified that the Petitioner did not have a motive to forge the checks because he received $52,000 outside of the estate and that trial counsel believed the estate was insolvent when the Petitioner went to help with repairs. On cross-examination, trial counsel testified that he believed that he spent an adequate amount of time reviewing the evidence, that he had been practicing criminal law for almost thirty years, and that he prepared for the Petitioner's case similarly to how he would prepare for other similar cases.

Trial counsel testified that the State offered to allow the Petitioner to plead guilty to misdemeanor offenses in exchange for probation, that he spoke with the Petitioner by telephone on October 11, 2013, and that the Petitioner responded, "no plea." On cross-examination, trial counsel testified that on October 11, 2013, he advised the Petitioner of

the plea offer and "the range that he would be if he were convicted." Trial counsel stated that he advised the Petitioner of problems with his criminal record as it related to sentencing around the time they discussed the plea offer. On cross-examination, trial counsel was unable to recall exactly what he told the Petitioner about his sentencing exposure but recalled informing him that he would receive a "long sentence" if convicted of the offenses. Trial counsel testified that he did not pressure the Petitioner to accept the plea or to proceed to trial.

In its order denying the Petitioner's petition, the post-conviction court considered the facts established at trial, the evidence at the post-conviction relief hearing, and the Petitioner's claims. Regarding the Petitioner's claim that trial counsel failed to consult a handwriting expert, the post-conviction court accredited trial counsel's testimony that he discussed a handwriting expert with the Petitioner, that he never told the Petitioner a handwriting expert would cost $40,00 to $50,000, and that the Petitioner did not have the funds to hire an expert. The post-conviction court found that the Petitioner decided not to hire an expert and that trial counsel was not deficient by failing to consult a handwriting expert.

In relation to trial counsel's efforts to locate and interview witnesses, the post-conviction court found that the Petitioner speculated that one or more unidentified witnesses would "remember a person using a check to pay for merchandise or services nearly three years after the transaction" and that he testified that he did not know any of the witnesses. The post-conviction court found that the Petitioner admitted he had numerous prior convictions for criminal conduct. The court found that it could not speculate how the unknown witnesses would have testified, whether such testimony would have been helpful to the defense, or whether any of the witnesses could have been found by a reasonable investigation, because none of them were called to testify at the post-conviction hearing. The post-conviction court found that trial counsel was not deficient regarding this claim.

Regarding the Petitioner's claim that trial counsel failed to effectively meet and confer with him, the post-conviction court found that the Petitioner's testimony that he only met with trial counsel once for an approximate one-hour period about three days before trial lacked credibility. The post-conviction court credited the testimony of trial counsel that he met with the Petitioner in April 2013 and on other occasions, including October of 2013, when the Petitioner rejected the State's plea offer relayed to him by trial counsel. The post-conviction court noted that trial counsel practiced criminal law for thirty-two years and conducted many jury trials during that time, that trial counsel's demeanor did not change when questioned by post-conviction counsel or the State's counsel, and that "he answered the questions directly and completely." On the other hand, the post-conviction court found that the Petitioner's demeanor changed during

cross-examination and "seemed to be more combative with counsel and did not answer questions directly." The court found that trial counsel met with the Petitioner prior to trial and discussed a plea offer with him "well in advance of trial." The post-conviction court found that trial counsel was not deficient regarding this claim. The post-conviction court denied the Petitioner's petition, and the Petitioner appeals.

## ANALYSIS

The Petitioner claims that he received ineffective assistance of counsel because trial counsel failed to: consult a handwriting expert and properly advise him of the cost of retaining one; thoroughly investigate or pursue a misidentification defense by seeking professional assistance to enhance the surveillance video and interviewing witnesses; consult with the Petitioner prior to trial; and convey a plea offer. The State responds that the post-conviction court properly denied the Petitioner relief. We agree with the State.

A petitioner may request post-conviction relief by asserting grounds alleging that his "conviction or sentence is void or voidable because" it abridged his constitutional rights provided by the Tennessee or the United States constitutions. T.C.A. § 40-30-103. To obtain post-conviction relief, a petitioner must prove the allegations of fact made in the petition by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "[Q]uestions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001) (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Additionally, appellate courts may not "substitute their own inferences for those drawn by the trial court." *Id.* (citing *Henley*, 960 S.W.2d at 579). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (citations omitted).

A criminal defendant has a right to the assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to assistance of counsel inherently guarantees that counsel's assistance is "effective." *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). To prove that counsel was ineffective, a petitioner must show that (1) his counsel performed deficiently and (2) such deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This standard requires a petitioner to demonstrate that the "services rendered or the advice given" were "'below the range of competence demanded of attorneys in criminal cases.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Counsel must have made errors so serious that counsel was not functioning as the "'counsel'" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Measuring counsel's performance requires giving deference to counsel's decisions, and courts must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 669. Accordingly, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland* 466 U.S. at 689). The "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Adequate preparation includes counsel's "duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691). Counsel's decision to not investigate must be assessed by courts "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

To demonstrate that a counsel's deficient performance prejudiced the defense, a petitioner must prove "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Dellinger*, 279 S.W.3d at 294 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a petitioner must establish both deficiency and prejudice to prove ineffective assistance of counsel, a court need not address both prongs where the petitioner has failed to establish one of them. *See Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The Petitioner claims that trial counsel was ineffective by failing to consult a handwriting expert and improperly advising him of the cost of doing so. The post-conviction court accredited trial counsel's testimony that he discussed a handwriting expert with the Petitioner, that he never told the Petitioner a handwriting expert would

- 10 -

cost $40,00 to $50,000, and that the Petitioner did not have the funds to hire an expert. We defer to the court's credibility determination. *See Fields*, 40 S.W.3d at 456. Additionally, the Petitioner did not call a handwriting expert to testify at the post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 758 (Tenn. 1990). Absent a handwriting expert's testimony at the hearing, the potential prejudice resulting from the lack of that testimony at trial cannot be ascertained under the evidence presented by the Petitioner in this case. *Id.* Thus, the Petitioner has failed to establish deficiency or prejudice with respect to this claim.

The Petitioner next claims that trial counsel was ineffective when he failed to thoroughly investigate or pursue a misidentification defense by seeking professional assistance to enhance the surveillance video and interviewing witnesses. Specifically, the Petitioner claims that trial counsel failed to locate and interview the employees who accepted the forged checks and failed to adequately interview Ms. Roberts prior to trial. Because the Petitioner did not call any of the employees who accepted the forged checks to testify at the hearing, he did not establish prejudice. *See Black*, 794 S.W.2d at 758. Trial counsel interviewed Ms. Roberts over the telephone and sought to enhance the video but was unable to do so. Additionally, the Petitioner did not present any evidence showing the extent to which the surveillance video could be enhanced and did not call Ms. Roberts to testify at the hearing to explain how further interviewing could have made her testimony more convincing at trial. Absent evidence demonstrating the effect of these alleged omissions from trial counsel's investigation, we decline to speculate as to their prejudicial effect on the outcome of the trial. We conclude that the Petitioner has failed to show deficiency or prejudice regarding this claim.

Finally, the Petitioner claims both that trial counsel failed to adequately confer with him and failed to convey a plea offer. Noting that the Petitioner testified that he only met with trial counsel to discuss his case one time, the post-conviction court found his hearing testimony lacking credibility. Trial counsel testified that he met with the Petitioner in April of 2013, that the trial occurred in February of 2014, and that he met with the Petitioner on other occasions, such as in October of 2013 when he discussed and a plea offer and the Petitioner's sentencing range and when the Petitioner rejected the plea offer. The post-conviction court observed that the Petitioner's demeanor changed during cross-examination and seemed more combative and unwilling to answer questions directly, while trial counsel's demeanor did not change and answered questions directly and completely. We defer to the post-conviction court's findings that the Petitioner's testimony lacked credibility and that trial counsel's testimony was credible. *See Fields*, 40 S.W.3d at 456. The post-conviction court found that trial counsel met with the Petitioner prior to trial to prepare a defense and discussed a plea offer with the Petitioner

in advance of trial, which the Petitioner rejected. Additionally, the Petitioner conceded at the hearing that he probably would not have accepted the plea offer. The Petitioner has not shown that trial counsel was deficient and has not shown a reasonable probability that the outcome would have been any different absent any deficiency with respect to either of these claims.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE